NOT FOR PUBLICATION                                     (Doc. Nos. 42, 43, 47)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| LINDSEY ALLEN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>WHITEBRIDGE CONDOMINIUM ASSOC., INC., et al.,<br>　　　　　Defendants. | Civil No. 14-3559 (RBK/KMW)<br><br>**OPINION** |

**KUGLER**, United States District Judge:

Lindsey Allen ("Plaintiff") brings federal claims under the Fair Housing Act and state law claims under the New Jersey Law Against Discrimination ("NJLAD") against the Whitebridge Condominium Association, Inc., Gloria Damiani, and KA Diehl and Associates (collectively, "Defendants") for alleged discrimination based on Plaintiff's familial status and the race of her children. This matter comes before the Court on Defendant Damiani's Motion for Summary Judgment (Doc. No. 42) and Defendants KA Diehl & Associates and White Bridge Condominium Association, Inc.'s Motion for Summary Judgment (Doc. No. 43) and Motion to Seal (Doc. No. 47). For the following reasons, Defendants' motions for summary are **GRANTED IN PART** and **DENIED IN PART AS MOOT** and Defendants' Motion to Seal is **GRANTED**.

1

## I. FACTUAL BACKGROUND

### A. Association Interactions

The facts, in the light most favorable to the Plaintiff are as follows: Plaintiff purchased a unit at 1207 Squirrel Road in Marlton, New Jersey on March 20, 2014. Defendants' Statement of Material Facts ("Defs.' Statement") ¶ 3 (Doc. No. 43-7); Plaintiff's Response to Defendants' Statement of Material Facts ("Pl.'s Resp.") ¶ 3 (Doc. No. 50-3). The unit is one of over 230 units within the Whitebridge Condominium community. Defs.' Statement ¶ 6; Pl.'s Resp. ¶ 6. 1207 Squirrel Road is a deed restricted unit reserved for people of low and moderate income. Defs.' Statement ¶ 4; Pl.'s Resp. ¶ 4.

Ownership of units within Whitebridge is subject to the provisions of the Whitebridge Condominium Master Deed, by-laws, and the rules and regulations promulgated by the Whitebridge Condominium Association ("the Association"). Defs.' Statement ¶ 8; Pl.'s Resp. ¶ 8. The Association enforces its rules and regulations and issues notices of rules violations to residents. Defs.' Statement ¶ 9; Pl.'s Resp. ¶ 9.

One such rule enforced by the Association is the requirement that all owners/residents must submit proof that they have a HO6 Homeowners Insurance Policy in place. Defs.' Statement ¶ 11; Pl.'s Resp. ¶ 11. On or about April 4, 2014, Defendant KA Diehl sent a request for insurance certification to Plaintiff. Defs.' Statement ¶ 14; Pl.'s Resp. ¶ 14. Plaintiff did not respond to this request as of May 30, 2014, and she was issued a notice of violation. Defs.' Statement ¶ 15; Pl.'s Resp. ¶ 15. Plaintiff subsequently provided proof of insurance and the matter was closed. Defs.' Statement ¶ 16; Pl.'s Resp. ¶ 16. Plaintiff testified that she considered the request for proof of insurance to be harassment because she produced the information at the real estate settlement for the property on March 20, 2014. Defs.' Statement ¶ 17; Pl.'s Resp. ¶ 17.

Settlement for the Plaintiff's purchase of her unit took place at the Turnkey Title Company. Defs.' Statement ¶ 18; Pl.'s Resp. ¶ 18. Turnkey's President testified that their file had no request from the Association for the insurance policy. Defs.' Statement ¶ 19; Pl.'s Resp. ¶ 19.

The Association and KA Diehl also enforce regulations requiring residents to keep their units in good repair. On May 4, 2014, a member of the Whitebridge Board reported that a window in Plaintiff's unit was being held open with a phonebook. Defs.' Statement ¶ 20; Pl.'s Resp. ¶ 20. Plaintiff received a notice of violation the next day, which requested that she repair the window. Defs.' Statement ¶ 21; Pl.'s Resp. ¶ 21. Plaintiff testified that there was nothing wrong with the window; she simply did not know how to operate the window. Defs.' Statement ¶ 22; Pl.'s Resp. ¶ 22. Plaintiff did not respond to the first notice, and was issued a notice and right to defend on May 20, 2014. Defs.' Statement ¶ 23; Pl.'s Resp. ¶ 23. Plaintiff indicated that the window had been corrected on May 22, 2014, and a representative from KA Diehl informed her that the matter was closed. Defs.' Statement ¶ 24-25; Pl.'s Resp. ¶ 24-25. On May 29, 2014, Plaintiff's counsel requested an ADR hearing from Defendant KA Diehl. Defs.' Statement ¶ 26; Pl.'s Resp. ¶ 26. Defendant notified counsel that the matter was resolved the next day. Defs.' Statement ¶ 27; Pl.'s Resp. ¶ 27.

KA Diehl and the Association also administer passes for the condominium pool. The Association mailed Plaintiff a welcome package containing information for obtaining pool passes around April 2, 2014. Defs.' Statement ¶ 28-29; Pl.'s Resp. ¶ 28-29. This information was also available on the Association's website. Defs.' Statement ¶ 31; Pl.'s Resp. ¶ 31. The information informed residents that all unit owners needed to provide the necessary information and photos by April 15, 2014, lest they incur a $5.00 fee per pass. Defs.' Statement ¶ 33-34; Pl.'s Resp. ¶ 33-34. Plaintiff applied for pool passes on May 20, 2014, and was charged a five-dollar

fee per pass, as were eight other residents. Defs.' Statement ¶ 35-36; Pl.'s Resp. ¶ 35-36. Plaintiff and her family used the pool nine times in 2014, including instances when Plaintiff's boyfriend accompanied her children to the pool without her. Defs.' Statement ¶ 41-42; Pl.'s Resp. ¶ 41-42. Plaintiff and her family used the pool twenty-two times in 2015, including instances when the children's grandmother accompanied them to the pool without Plaintiff. Defs.' Statement ¶ 43-44; Pl.'s Resp. ¶ 43-44. Plaintiff alleges that her children were often denied entry to the pool, or were kicked out when they attempted to go without her. Plaintiff's Counter-Statement of Material Facts ("Pl.'s Statement") ¶ 35.

Plaintiff also alleges that the limitation on the number of pool passes was motivated by complaints from residents regarding too many children at the pool. Pl.'s Statement ¶ 45. Damiani acknowledged that the pool rules would prevent Plaintiff's children from going to the pool with another adult if Plaintiff was unavailable. *Id.* ¶ 46. Plaintiff further notes that Whitebridge closed their playground and sandbox, which left no remaining designated areas for children to play. *Id.* ¶ 37-42.

### B. Interactions with Defendant Damiani

Plaintiff also alleges a number of unpleasant interactions with Defendant Gloria Damiani. Plaintiff moved into her unit at Whitebridge around March 20, 2014. Defs.' Statement ¶ 48; Pl.'s Resp. ¶ 48. Plaintiff pulled a U-Haul van over the curb onto the front yard of her unit while moving in. Defs.' Statement ¶ 49; Pl.'s Resp. ¶ 49. A resident reported that a van was pulled onto the lawn, and Damiani called another member of the Board to have them ask Plaintiff to move the van. Defs.' Statement ¶ 50-51; Pl.'s Resp. ¶ 50-51. Plaintiff told that Board member that she would move the van as soon as the two dressers on the loading ramp had been removed. Pl.'s Statement ¶ 2. Damiani then appeared at Plaintiff's unit, where she told Plaintiff to move the van

immediately or be fined. Defs.' Statement ¶ 53; Pl.'s Resp. ¶ 53. Damiani stated that she would wait at the unit until the van was moved. *Id.* Plaintiff explained that the van would be moved as soon as the men finished removing the furniture, but Damiani stated that she would not wait for the furniture to be moved. Pl.'s Statement ¶ 4-5. Plaintiff alleges that Damiani had been yelling during this interaction. *Id.* ¶ 6. The van was moved shortly thereafter, Damiani left the unit, and no letter, notice of violation, or fine was issued to Plaintiff. Defs.' Statement ¶ 56-57; Pl.'s Resp. ¶ 56-57.

Plaintiff alleges that Damiani then approached her on March 21, 2014 while she was waiting for her children to arrive home from school. Pl.'s Statement ¶ 7. Damiani allegedly asked Plaintiff if she smoked cigarettes, then told Plaintiff that she should not be dropping cigarette butts in that area. Defs.' Statement ¶ 58; Pl.'s Resp. ¶ 58; Pl.'s Statement ¶ 7. Damiani said this despite Plaintiff's statement that she did not smoke. *Id.* No letter, notice of violation, or fine was issued to Plaintiff after this interaction. Defs.' Statement ¶ 59; Pl.'s Resp. ¶ 59.

One week later, on March 28, 2014, Damiani allegedly pulled up in her car while Plaintiff was outside of her unit with her children. Defs.' Statement ¶ 60; Pl.'s Resp. ¶ 60; Pl.'s Statement ¶ 9. Damiani allegedly suggested that the children use the basketball court to play with their basketball and pogo stick because those toys made a lot of noise and could potentially damage vehicles. Defs.' Statement ¶ 61; Pl.'s Resp. ¶ 61. A loud argument ensued, and Damiani allegedly said, "[i]f it was up to me, there wouldn't be any children in this community." Defs.' Statement ¶ 62-63; Pl.'s Resp. ¶ 62-63. Plaintiff described Damiani's demeanor as "not nice." Pl.'s Statement ¶ 9. No letter, notice of violation, or fine was issued to Plaintiff after this interaction. Defs.' Statement ¶ 64; Pl.'s Resp. ¶ 64.

A few days later, on April 2, 2014, Damiani appeared to tell Plaintiff that nothing could be left outside of the unit. Pl.'s Statement ¶ 11. Damiani was referencing a fishing pole that Plaintiff's son had left propped against the unit. *Id.* Plaintiff alleges that other families in the condominium left items such as chairs, potted plants, and toys outside without receiving such contact. *Id.* ¶ 12. Plaintiff also alleges that her neighbors had lawn ornaments and benches outside of their respective units. *Id.* ¶ 13. No letter, notice of violation, or fine was issued to Plaintiff after this interaction. Defs.' Statement ¶ 67; Pl.'s Resp. ¶ 67.

On April 23, 2014, Damiani again approached Plaintiff upon seeing that one of her sons was bouncing a basketball outside of their unit. Defs.' Statement ¶ 68-69; Pl.'s Resp. ¶ 68-69. Damiani allegedly told Plaintiff that bouncing of balls was prohibited, and again aired her concern about the ball hitting cars. Defs.' Statement ¶ 69; Pl.'s Resp. ¶ 69; Pl.'s Statement ¶ 15. No letter, notice of violation, or fine was issued to Plaintiff after this interaction. Defs.' Statement ¶ 70; Pl.'s Resp. ¶ 70.

Plaintiff worked 7 p.m. to 7 a.m. from May 10, 2014 into May 11, 2014. Pl.'s Statement ¶ 16. Plaintiff's children spread flower petals over a stretch of their unit's walkway some time before she arrived home from work. Defs.' Statement ¶ 71; Pl.'s Resp. ¶ 71. When Plaintiff arrived home, she was concerned that she would be cited for violating the Associaton's rules and regulations, and immediately began cleaning up the flower petals. Defs.' Statement ¶ 72-73; Pl.'s Resp. ¶ 72-73. Damiani arrived while Plaintiff was still sweeping up the flower petals. Defs.' Statement ¶ 75; Pl.'s Resp. ¶ 75; Pl.'s Statement ¶ 20. Damiani informed Plaintiff that she was in violation of the Association's rules concerning littering. Defs.' Statement ¶ 75; Pl.'s Resp. ¶ 75. No letter, notice of violation, or fine was issued to Plaintiff after this interaction. Defs.' Statement ¶ 76; Pl.'s Resp. ¶ 76.

The events of May 17, 2014 are the source of much contention. Plaintiff arrived home from work around 8:30 a.m, took a shower, and laid down while her children watched television. Pl.'s Statement ¶ 22. One of Plaintiff's children came to tell her that someone was standing outside of their window with a barking dog. *Id.* Plaintiff claims that she walked out to her living room and clearly saw Damiani looking through the window. *Id.* Plaintiff made eye contact with Damiani, and Damiani moved along. *Id.* Several hours later, two investigators from the New Jersey Division of Child Protection and Permanency ("DCPP") arrived to investigate a report that Plaintiff's children had been left unattended the night before. *Id.* ¶ 23-24. For reasons stated under seal, Plaintiff believes that Damiani was responsible for this call to DCPP. *See* Pl.'s Br. at 7. Plaintiff states that DCPP investigators came to her unit multiple times after May 17, 2014, and she was allegedly told that a neighbor made additional calls claiming that she had left her children "home alone." Pl.'s Statement ¶ 28-29. Damiani claims that she had no direct or indirect involvement with contacting law enforcement regarding Plaintiff. *Id.* ¶ 27.

Plaintiff filed the complaint in this case on June 4, 2014. Compl. (Doc. No. 1). Defendant Damiani moved for summary judgment on April 14, 2016, and Defendants KA Diehl and Whitebridge Condominium Assoc., Inc. moved for summary judgment on April 15, 2016. Defendants submitted the instant motion to seal on April 21, 2016.

## II. STANDARD

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In

deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Id.* at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in her favor. *Id.* at 255.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. Furthermore, the nonmoving may not simply allege facts, but instead must "identify those facts of record which would contradict the facts identified by the movant." *Port Auth. of New York and New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002). The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. DISCUSSION

#### A. Fair Housing Act Claims

*1. Count I: Intentional Discrimination under 42 U.S.C. § 3604(a)*

Plaintiff's first count alleges intentional discrimination prohibited by section 3604(a) of title 42. Section 3604(a) states:

> it shall be unlawful . . . to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

The Court notes that this portion of the statute most often deals with discrimination *before* a tenant occupies housing. Defendants note that section 3604(a) has been construed to apply to post-acquisition discrimination. Defendants' Br. at 3 (citing *Bloch v. Frischholz*, 587 F.3d 771

8

(7th Cir. 2009) (Doc. No. 43-1). Plaintiff acknowledges that the Third Circuit has not weighed in on the metes and bounds of 3604(a)'s application to post-acquisition discrimination, but notes that "at least one District Court in the Third Circuit specifically relied on *Bloch* to conclude" that "§ 3604(a) reaches post-acquisition discrimination." Pl's Opp'n Br. at 6 (Doc. No. 50).[1]

Plaintiff appears to only be arguing that a Fair Housing Act ("FHA") claim is available for post-acquisition discrimination. The Court does not see any contention over this matter. Rather, Defendants cite cases that define the *scope* of such a claim. *Bloch*, in recognizing the viability of an FHA claim for post-acquisition discrimination explained that "§ 3604(a) may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction." *Bloch*, 587 F.3d at 776.

The Court believes that the analogy to a constructive eviction is apt in light of 3604(a)'s statutory language of "otherwise make unavailable or deny." 42 U.S.C. § 3604(a). New Jersey courts have explained that a constructive eviction occurs when a landlord's "act or omission . . . renders the premises substantially unsuitable for the purpose for which they are leased, or which seriously interferes with the beneficial enjoyment of the premises." *Reste Realty Corp. v. Cooper*, 251 A.2d 268, 274 (N.J. 1969). It is also generally accepted that "a tenant's right to claim a constructive eviction will be lost if [s]he does not vacate the premises within a reasonable time after the right comes into existence." *Id.* at 277.

The Court does see any dispute over material facts that would suggest Plaintiff has been constructively evicted from her apartment. There is no dispute that Plaintiff purchased the unit at 1207 Squirrel Road, Marlton, New Jersey in March 2014. Defs.' Statement ¶ 3; Pl.'s Resp. ¶ 3.

---

[1] The Court notes that the case they cite for this position, *Neals v. Mortg. Guar. Ins. Corp.*, 2011 WL 1897442, at *3 (W.D. Pa. April 6, 2011) is actually a magistrate report and recommendation. The District Court later adopted the report and recommendation. *See Neals v. Mortgage Guar. Ins. Corp.*, 2011 WL 1897452 (W.D. Pa. May 18, 2011). The Court suggests that Plaintiff's counsel should carefully cite-check such claims in the future.

There is no dispute that Plaintiff still resides at 1207 Squirrel Road. Compl. ¶ 5. Therefore, Plaintiff still has use of 1207 Squirrel Road more than two and a half years after the alleged conduct underlying this case. The Court holds that no reasonable jury could determine that Plaintiff has been constructively evicted from her condominium in light of these uncontested facts. Accordingly, Defendants' motion for summary judgment is granted with respect to Count I.

  2. *Count II: Disparate Impact under 42 U.S.C. § 3604(a)*

Count II of Plaintiff's complaint alleges that Defendants conduct had a disproportionate or disparate impact on Plaintiff in violation of 42 U.S.C. § 3604(a). This Court has stated that a Plaintiff must "demonstrate that the defendant denied or made housing unavailable to her, and that the defendant[s'] actions were based on her status in a protected class," to make out a claim under section 3604(a). *Beakley v. United States*, No. 14-6502, 2015 WL 4591268, at * 3 (D.N.J. July 29, 2015) (citing *Koorn v. Lacey Twp.*, 78 F. App'x 199, 206 (3d Cir. 2003)). The Court further noted that "[t]he FHA can be violated either by intentional discrimination or if a practice has a disparate impact on a protected class." *Id.* (quoting *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381 (3d Cir. 2011)).

The Court again turns to section 3604(a)'s. Simply put, Plaintiff has not alleged that Defendants alleged conduct have denied housing or made housing in Whitebridge unavailable to Plaintiff. As noted in the Court's discussion of Count I, Plaintiff still lives in her Whitebridge condominium. Plaintiff has not put forward any facts to demonstrate that she has been constructively evicted from her condominium. Therefore, there is no genuine dispute of material fact regarding a necessary element of a claim under section 3604(a). Accordingly, Defendants' motion for summary judgment is granted with respect to Count II.

### *3. Claim under 42 U.S.C. § 3617*

The Court observes that Defendants and Plaintiff both address whether Plaintiff has adequately made out a claim under section 3617 of title 42. The Court notes that the Complaint contains no reference to 42 U.S.C. § 3617. Defendants bring up section 3617 for the first time in their motion for summary judgment while arguing that Plaintiff's allegations, at most, can be actionable under section 3617. Defs.' Br. at 13. Plaintiff then responds, arguing that summary judgment should not be entered on the section 3617 claim. Pl.'s Opp'n Br. at 7. Plaintiff is correct that summary judgment should not be entered regarding a section 3617 claim; it would be inappropriate for the court to enter summary judgment for a claim that does not exist. "[C]laims [that] were not alleged in the complaint [] cannot be raised for the first time in opposition to a motion for summary judgment." *Bey v. Daimler Chrysler Servs. of N. Am.*, No. 04-6186, 2006 WL 361385, at *11 (D.N.J. Feb. 15, 2006). While it appears that Defendants are the first to raise this new claim in their motion for summary judgment, rather than Plaintiff, "the proper procedure . . . to assert a new claim would be to amend the complaint in accordance with Federal Rule of Civil Procedure 15(a)." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Accordingly, the Court will not opine on a claim under section 3617, as such a claim does not appear on the face of the complaint.

### B. NJLAD Claim

Count III of Plaintiff's complaint alleges violations of the NJLAD, specifically discrimination "in terms of housing or in the furnishing of facilities or services in connection therewith on the basis of race, color, marital status, familial status, or source of lawful income used for mortgage payments." Compl. ¶ 54.

11

The Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)). Plaintiff's claims under federal law have been dismissed, and the Court does not observe an affirmative justification for this Court to retain supplemental jurisdiction over the state law claims at this time. As such, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Count Three is therefore dismissed without prejudice. Accordingly, Defendants' motions for summary judgment with regard to Count III are denied as moot.

### C. Motion to Seal

The request to seal is governed by Local Rule 5.3, which provides in pertinent part that a request to seal must be presented by motion. The motion papers must describe "(a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available." *See* L. Civ. R. 5.3(c)(3). Rule 5.3 also provides that any order or opinion on any motion to seal "shall include findings on the factors set forth in (c)(3) . . . as well as other findings required by law . . . ." L. Civ. R. 5.3(c)(6).

It is well-established that there is a "common law public right of access to judicial proceedings and records." *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001). This is consistent with well-established precedent, based on First Amendment considerations and the common law right of access to judicial records, that documents filed with the court and judicial

proceedings are open to the public. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *FTC v. Lane Labs-USA, Inc., et al.*, No. 00-3174, 2007 WL 316462, at *1 (D.N.J. Jan. 30, 2007). In order to overcome this presumption of a public right of access, the movant must demonstrate that "good cause" exists for the protection of the material at issue. *Securimetrics, Inc. v. Iridian Techs., Inc.*, No. 03-4394, 2006 WL 827889, at *2 (D.N.J. Mar. 30, 2006). Good cause exists when a party makes a particularized showing that disclosure will cause a "clearly defined and serious injury to the party seeking closure." *Id.* (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994)). A Motion to Seal can be granted when the movant proves that the information is confidential in nature and that allowing the general public to access the information will cause a specific and serious injury. *Pansy*, 23 F.3d at 788. The claimed injury must be specifically stated because "'[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning,' do not support a good cause showing." *Id.* at 786 (citing *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)).

     Defendants' Certification of Counsel explains that the documents to be sealed are a portion of the DCPP file regarding the DCPP's investigation of Plaintiff. Zangerle Cert. ¶ 3 (Doc. No. 47-1). Defendants' counsel also notes Judge Williams's Order releasing these materials, which explicitly states that "the record and information contained in or derived from said record shall not otherwise be disclosed to any other person for any other reasons nor disseminated or made public by any means direct or indirect." Zangerle Cert., Ex. A. The Certification identifies the specific injury that would occur if the motion is not granted (namely, failure to comply with Judge Williams's order). Zangerle Cert. ¶ 6. The Court finds that Defendants' Certification adequately supports good cause showing that the filing should be sealed. Accordingly, Defendants' motion to seal is granted.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Whitebridge Condominium Association, Inc., Gloria Damiani, and KA Diehl and Associates motions for summary judgment are **GRANTED** as to Counts I and II and **DENIED AS MOOT** as to Count III. Count III is **DISMISSED WITHOUT PREJUDICE**. Defendants' Motion to Seal is **GRANTED**.

Dated:  12/28/2016                                              s/ Robert B. Kugler
                                                                                                           ROBERT B. KUGLER
                                                                                                           United States District Judge